**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

IN RE:

**BAMBI ALICIA HERRERA-EDWARDS,**

      **Debtor.**

_____/

**BAMBI ALICIA HERRERA-EDWARDS,**

      **Appellant,**

**v.**                                                          **Case No.: 8:17-cv-328-T-36**

**BERNARD EDWARDS COMPANY, LLC**
**and JESS S. MORGAN & CO., INC.,**

      **Appellees.**

_____/

## OPINION AND ORDER

    **BEFORE THE COURT** are Bambi Herrera-Edwards' consolidated bankruptcy appeals from a final judgment and order denying her motion for a new trial.

    After the death of her husband, Edwards began receiving substantial income from his music copyrights pursuant to the terms of a 1997 settlement agreement. By 2012, Edwards' financial difficulties prompted her to file a Chapter 11 bankruptcy petition. Apparently no longer satisfied with the terms of her settlement, Edwards attempted to re-write its terms in bankruptcy court by (1) acquiring administration rights to the copyrights, (2) obtaining a share of her late husband's royalty income, and (3) eliminating a perpetual 5% management fee.

    After a six-day trial, the bankruptcy court held that the 1997 settlement agreement was controlling as written and denied Edwards' claims. For the reasons that follow, the Court will affirm the bankruptcy court's decision.

I.     **Factual Background**[1]

Bambi Herrera-Edwards ("Edwards"), was once married to Bernard Edwards, a well-known guitarist, songwriter, and producer, who co-founded the funk and disco band Chic with Nile Rodgers.  Mr. Edwards and Mr. Rodgers authored and performed many popular songs, including "We Are Family" and "Le Freak."

Mr. Edwards employed Wallace Franson and Defendant-Appellee Jess S. Morgan & Co., Inc. ("JSM") to manage his business and financial affairs.  Mr. Edwards and Mr. Franson orally agreed that JSM would take a perpetual 5% fee of Mr. Edwards' gross income.

Mr. Edwards died on April 18, 1996.  He was survived by Bambi Edwards, his ex-wife Alexis Edwards, and his six children.  Mr. Edwards' estate was submitted for probate in Westport, Connecticut.  Franson was appointed as executor.

During the probate proceedings, Edwards was represented by two lawyers from the law firm Ryan, Ryan, Johnson, McCaghey & Deluca, LLP.  Edwards agreed to pay the firm a perpetual fee of 10% on all amounts exceeding $1.2 million in the event of a settlement.

Edwards asserted a $10 million tort claim against the estate in federal court, as well as claims in the probate case for a spousal share and for ownership of a home in Westport.  Doc. 10-316.  The probate court allowed Edwards' claim for a spousal share, but denied Edwards' claim to ownership of the home.  Doc. 10-6 at 3-4.

While those rulings were on appeal, and while the federal case was still pending, Edwards attended a mediation with Franson and some of Mr. Edwards' children.  At the conclusion of the mediation, the parties in attendance signed a handwritten stipulation ("the July 9th Stipulation").

---

[1] Except where noted, the following facts are derived from the bankruptcy court's detailed factual findings.  *See* Doc. 11-2 at 3-15.

In relevant part, the July 9th Stipulation stated:

> Bambi Edwards shall be assigned full and complete ownership and interest in 37-1/2% of *all royalties and other payments received from the copyrights and other such interests* owned by Bernard Edwards at the time of his death, and shall be paid such royalties within 30 days after receipt by Jess S. Morgan & Company of such sums.

Doc. 10-121 at 2 (emphasis added).   Edwards relies on the reference to "royalties" to support her claim for a portion of Mr. Edwards' royalty income.

In the July 9th Stipulation, the parties agreed that they would execute additional documents "as are necessary to effectuate the terms and conditions of this Stipulation." *Id.* at 3.   Accordingly, a draft settlement agreement was circulated on July 16, 1997.   That same day, Franson's attorney, Richard Pober, submitted to the probate court an Application for Approval of Compromise Claim ("the Application") which outlined the terms of the settlement.   However, the Application did not mention royalties and instead provided:

> The estate agrees that Bambi Edwards shall receive a participation in the *income stream of the copyrights* to be received by the estate in the percentage of 37 ½ percent, net after all expenses.

Doc. 10-324 at 2 (emphasis added).   The Application also stated that the parties would enter into a standard co-publishing agreement, that Franson would act as publisher of the copyrights, that Franson would have full and complete administration rights, and that Edwards and Alexis Edwards would have no administration rights whatsoever.   *Id.*

During settlement negotiations, Edwards was represented by Ronald St. Onge, an intellectual property attorney, who billed time on her case on July 29th and July 30th.   On July 30, 1997, Edwards, Franson, Alexis Edwards, and the six children executed a settlement agreement ("the Settlement Agreement").   Relevant here, the Settlement Agreement stated:

> Bambi Edwards agrees to accept and the estate agrees to take any and all steps necessary to assign a 37½ percent participation in the *income stream from the copyrights* owned by Bernard Edwards Estate on the date of Bernard Edward's [*sic*] death after payment of all costs, expenses and debt related to the copyrights. The participation share of the income stream would be on a net basis after all estate, income and other taxes and the administrative expenses of the estate have been paid.

Doc. 10-342 at 3 (emphasis added). The Settlement Agreement included a similar provision in favor of Alexis Edwards, except her share in the income stream was 12½ percent. *Id.* at 4. The Settlement Agreement did not reference royalties.

The Settlement Agreement further provided that the parties would enter into a standard co-publishing agreement. Consistent with the terms proposed in the Application, the Settlement Agreement specified that Edwards and Alexis Edwards would have no administration rights to the copyrights:

> The co-publishing agreement will provide that (a) the executor of the estate will act as publisher of the copyrights and will have full and complete administration rights therein; (b) the executor will have the absolute right and ability to assign such administration rights to any person or entity, including but not limited to the trust for the children of Bernard Edwards; (c) Bambi Edwards and Alexis Edwards will be co-publishers, and *will have no administrative rights whatsoever regarding the copyrights*; and (d) all costs of administering the copyrights will be deducted "off-the-top" in determining revenue earned by the copyrights. The estate will file with the U.S. Copyright Office and other necessary entities such documents as are necessary to effectuate the transfer of the ownership interest, and costs of same shall be paid by the estate.

Doc. 10-342 at 4-5 (emphasis added). A separate paragraph stated:

> Bambi Edwards shall have the right to assign or sell her income stream only to any third party. *Bambi Edwards acknowledges that she has no administration rights in the copyrights* and that any third party would be subject to all terms and conditions as set forth in this agreement.

*Id.* (emphasis added). Finally, the Settlement Agreement approved a 5% fee to JSM as follows:

> All parties agree and approve the claim by Jess S. Morgan & Co. for a 5% fee on all deferred income and other income received by the estate of Bernard Edwards from

4

copyrights as a debt of the decedent.

*Id.* at 6.

The Settlement Agreement was signed by all parties, including Edwards, Franson, Alexis Edwards, each of Mr. Edwards' adult children, and the guardian for Mr. Edwards' youngest child, Leah Edwards, who was then a minor. The parties simultaneously executed mutual general releases, which covered:

> any, and all manner of . . . covenants, contracts, controversies, agreements, promises . . . EXCEPT FOR THE TERMS, CONDITIONS AND CONSIDERATION CONTAINED IN THE STIPULATION OF SETTLEMENT DATED JULY 30, 1997, WHICH REMAINS IN FULL FORCE AND EFFECT.

Doc. 11-89 at 2.

On August 21, 1997, Edwards, Alexis Edwards, and the estate executed a Co-Publishing Agreement, as contemplated by the Application and the Settlement Agreement. The Co-Publishing Agreement provided that Edwards and Alexis Edwards would have no administration rights in the copyrights, as follows:

> 2. <u>Grant of Rights.</u>
>
> (a) In consideration of all of the terms and conditions set forth herein and in the Settlement Agreement, Publisher hereby sells, assigns and transfers to Bambi Edwards thirty-seven and one-half percent (37.5%), and to Alexis Edwards twelve and one-half percent (12.5%) in and to all of Publisher's right, title and interest in the Compositions including, without limitation, all copyrights in the Compositions. To such effect, Publisher shall execute and deliver assignments of copyright and other documentation which may be reasonably requested to establish and record such ownership rights.
>
> (b) *Bambi and Alexis acknowledge that they shall have no administration rights in and to the Compositions,* and that they each grant to Publisher the sole and exclusive right to administer, control, use, exploit, receive income from, and otherwise deal in and for the Compositions, throughout the Territory, in perpetuity.

Doc. 10-343 at 2-3 (emphasis added). The Co-Publishing Agreement further stated: "The powers

granted to Publisher under this agreement are coupled with an interest and are irrevocable for any cause whatsoever." *Id.* at 3-4. "Publisher" is defined as the Estate of Bernard Edwards. *Id.* at 2.

On September 4, 1997, the probate court entered an order approving the Settlement Agreement. Under Connecticut law, court approval was required because the Settlement Agreement resolved disputed claims affecting the interests of Leah Edwards, a minor, and the value of the assets exceeded $10,000.

When the estate closed, Franson, as executor, filed copyright assignments with the U.S. Copyright Office, as required by the Settlement Agreement and the Co-Publishing Agreement. The assignment for Edwards, dated January 1, 2000, described the portion assigned as "an undivided thirty seven and one-half percent (37.5%)." Doc. 10-166 at 4. However, the estate expressly reserved administration rights, as follows:

> The Assignor hereby sells, assigns, transfers and sets over unto the Assignee the above-indicated portion of Assignor's right, title and interest in and to the musical compositions (or fractional shares thereof) listed on the annexed Schedule (the "Compositions") including, but not limited to the worldwide copyrights in and to said compositions, their titles, and lyrics (including renewals and/or extensions now or hereafter provided by law), *reserving, however, the exclusive right to administer, control, use, exploit[,] receive income from, and otherwise deal in and for said Compositions* (or, in the Assignor's sole discretion, to authorize third parties to do so, in the Assignor's name and on Assignor's behalf, in whole or in part and throughout the world or in lesser territories) through the world in perpetuity in accordance with the terms and conditions of the Co-Publishing Agreement dated August 21, 1997 among the Assignor, Bambi Edwards, and Alexis Edwards[.]

*Id.* (emphasis added). The assignment further stated that it was "subject to a lien to secure the payment to Jess S. Morgan & Company, Inc. of 5% of the gross receipts from exploitation of such assigned rights in perpetuity." *Id.*

Also on January 1, 2000, Franson filed a separate assignment conveying to each of the children's trusts "an undivided eight and one-third percent (8.333%) share of the copyright

6

ownership" and "an undivided sixteen and two thirds percent (16.667%) of the administration rights." Doc. 10-167 at 4. In contrast to the assignment to Edwards, Franson transferred to the trusts the "right to administer, control, use, exploit, receive income from, and otherwise deal in and for said Compositions." *Id.*

The following day, on January 2, 2000, Franson, as trustee for the six trusts, executed another assignment in favor of Defendant-Appellee Bernard Edwards Company, LLC ("BEC"), an entity that is owned by Edwards' children. That assignment conveyed 50% of the "copyright ownership" and 100% of the "administration rights" to BEC. Doc. 10-165 at 4.

After the estate closed, BEC, through JSM as its manager, remitted quarterly payments to Edwards pursuant to the Settlement Agreement. In each quarterly statement, BEC specified that Edwards was receiving "Writer/Publisher Income." Each quarterly statement also showed a 5% reduction, as payment to JSM.

In 2005, Edwards, through her accountant and her lawyer, sent a letter to JSM protesting the 5% fee. JSM responded by providing a copy of the copyright assignment, which identified the 5% lien. The accountant then sent Edwards' probate attorneys a fax, attaching the assignment with the handwritten notation, "why!!" However, Edwards did not pursue a claim against JSM relating to the 5% fee at that time. Instead, she negotiated a sunset on the perpetual 10% fee paid to her probate attorneys.

## II.    Procedural History

On October 17, 2012, Edwards filed for Chapter 11 bankruptcy protection (Bankr. Case No. 8:12-bk-15725-KRM). On April 4, 2014, Edwards filed a motion to reject the executory portions of the Co-Publishing Agreement in order to acquire administration rights to the copyrights. Doc.

10-29.  BEC filed a motion for summary judgment, to which Edwards responded in opposition. Docs. 10-93, 10-281. The bankruptcy court heard oral argument but deferred ruling on the motion. Doc. 11-401.

Edwards also initiated an adversary proceeding (Adv. Proc. No. 8:13-ap-641-KRM) raising seven claims against BEC and JSM, (collectively, "Defendants").  Doc. 11-10.  In substance, the claims sought a determination that Edwards was entitled to collect 37.5% of Mr. Edwards' artist and producer royalties and that JSM was not entitled to collect a 5% fee.

The bankruptcy court tried the motion to reject and the adversary proceeding together.  At the close of Edwards' case, Defendants made an *ore tenus* motion for judgment on partial findings. Doc. 11-428 at 163. Edwards filed a written response, and Defendants filed a reply. Docs. 11-429, 11-430. On November 2, 2016, the bankruptcy court issued written findings of fact, conclusions of law, and a final judgment in favor of Defendants on all issues. Doc. 11-2. Because the bankruptcy court entered the final judgment in both the main bankruptcy case and the adversary proceeding, Edwards filed separate appeals, which were docketed in district court as Case No. 8:17-cv-328 and Case No. 8:17-cv-330.

After the bankruptcy court issued its written decision, Edwards filed a motion for new trial, or alternatively, for amended and additional findings of fact, to which Defendants responded in opposition.  Docs. 10-551, 10-554.  On January 27, 2017, the bankruptcy court entered an order denying the motion in both the main case and the adversary proceeding. Doc. 10-6. Edwards filed separate appeals, which were docketed in district court as Case No. 8:17-cv-329 and Case No. 8:17-cv-331.

Edwards then filed an unopposed motion to consolidate the four appeals, which this Court

8

granted on March 8, 2017, designating the instant case (Case No. 8:17-cv-328) as the lead case. After consolidation, the parties filed their respective briefs in the lead case, and the Court heard oral argument on August 17, 2017.  Docs. 13, 14, 15, 19.  The matter is now ripe for decision.

## III.    Standard

Because Edwards appeals from a final judgment, the exercise of jurisdiction is proper pursuant to  28 U.S.C. § 158(a)(1).[2]  *In re Donovan*, 532 F.3d 1134, 1136 (11th Cir. 2008).  The bankruptcy court's legal conclusions are reviewed *de novo* and the factual findings are reviewed for clear error.  *In re JLJ, Inc.*, 988 F.2d 1112, 1113 (11th Cir.1993).  "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed."  *Crawford v. Western Elec. Co., Inc.*, 745 F.2d 1373, 1378 (11th Cir. 1984) (internal quotation marks omitted).

## IV.    Discussion

## A.    Administration Rights

Edwards' first issue on appeal challenges the bankruptcy court's denial of her motion to reject the Co-Publishing Agreement.

Pursuant to 11 U.S.C. § 365(a), a trustee or debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." *Thompkins v. Lil'Joe Records, Inc.*, 476 F.3d 1294, 1300 n.8 (11th Cir. 2007).  Rejection constitutes a breach, which gives rise to a claim for rejection damages. 11 U.S.C. § 365(g); *Thompkins*, 476 F.3d at 1306.

---

[2] To the extent that the proceedings were not within the bankruptcy court's core jurisdiction, the bankruptcy court found that the parties consented to trial in the bankruptcy court.  Doc. 11-2 at 3 n.4.  *Wortley v. Bakst*, 844 F.3d 1313, 1320-21 (11th Cir. 2017).

Rejection does not, however, cancel, rescind, or terminate the contract, nor does it "change the substantive rights of the parties to the contract." *Id.*; *In re The Ground Round, Inc.*, 335 B.R. 253, 261 (B.A.P. 1st Cir. 2005). "Rejection merely frees the estate from the obligation to perform[.]" *Thompkins*, 476 F.3d at 1306.

In evaluating whether to approve a motion to reject an executory contract, courts typically apply the business-judgment test, which asks whether the rejection will benefit the estate and unsecured creditors. *Westship, Inc. v. Trident Shipworks, Inc.*, 247 B.R. 856, 866 (M.D. Fla. 2000); *In re Gardinier, Inc.*, 831 F.2d 974, 976 n.2 (11th Cir. 1987). Similarly, in order to determine whether a contract is executory, the Eleventh Circuit tacitly endorses the "functional" approach, which provides that a contract is executory if "rejection would ultimately benefit the estate and its creditors." *Thompkins*, 476 F.3d at 1306 n.13.

In her motion to reject, Edwards argued that rejecting the executory portions of the Co-Publishing Agreement—most critically, the grant of the exclusive right to administer the copyrights—would allow her to receive an advance that could be used to pay her creditors more expeditiously. Doc. 10-29 at 4.

The bankruptcy court denied the motion, holding that Edwards could not reject the Co-Publishing Agreement in order to obtain administration rights because she never held administration rights in the first place. In reaching this decision, the bankruptcy court observed that rejection would not allow Edwards to avoid a right that had already vested in another party, nor would it allow the court to re-write or invalidate portions of the Settlement Agreement, which was a related and binding agreement. Because the Settlement Agreement expressly provided that Edwards had no administration rights, and because the copyright assignments expressly conveyed administration rights to the six trusts, and then to BEC, the bankruptcy court held that rejection could not be used

to vary the parties' legal status.  Doc. 11-2 at 16-18.

On appeal, Edwards asserts that the bankruptcy court never reached the merits of the rejection issue—by which Edwards appears to mean that the bankruptcy court never addressed whether rejection would benefit the estate. Doc. 13 at 17 n.11; Doc. 15 at 10 n.3.  While the bankruptcy court did not reach that issue, the bankruptcy court did rely on well-settled rejection concepts, most notably, the principle that rejection may not be used to "change the substantive rights of the parties to the contract."  *In re The Ground Round, Inc.*, 335 B.R. at 261; *accord In re Giordano*, 446 B.R. 744, 749 (Bankr. E.D. Va. 2010).  As explained below, that principle is dispositive in this case, and Edwards' failure to address it is fatal to her appeal.

Edwards instead emphasizes that she is a copyright "owner" and maintains that, as an owner, she necessarily possesses administration rights.  Doc. 13 at 14-16.  For instance, she points to testimony from her expert, attorney Richard Leher, who stated that paragraph 2(a) of the Co-Publishing Agreement granted Edwards administration rights because it transferred "all" rights to Edwards. Doc. 10-537 at 67, 69.  While Edwards admits that she granted those same administration rights to the estate in paragraph 2(b) of the Co-Publishing Agreement, she insists that she is entitled to reject that portion of the agreement in order to re-acquire the rights.

In advancing this argument, Edwards ignores controlling language in the court-approved Settlement Agreement and in the copyright assignments.  The Settlement Agreement expressly states: "Bambi Edwards acknowledges that she has no administration rights in the copyrights." Doc. 10-342 at 5.  Likewise, the copyright assignments withhold from Edwards "the exclusive right to administer" the copyrights and instead transfer 100% of the administration rights to the children's trusts and to BEC.  Doc. 10-166 at 4; Doc. 10-167 at 4.  And consistent with both the Settlement Agreement and the copyright assignments, the Co-Publishing Agreement conveyed administration

11

rights to the estate "in perpetuity" and stated that the powers granted to the estate "are irrevocable for any cause whatsoever." Doc. 10-343 at 3-4.

As a result, the facts of this case are similar to *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294 (11th Cir. 2007). In that case, the debtor, Luke Records, sought to reject a 1989 recording contract with rap artist Jeffrey Thompkins. *Id.* at 1298-99. The contract gave Luke Records ownership of the sound recording copyrights and, in exchange, Luke Records agreed to pay Thompkins royalties. *Id.* The bankruptcy court approved rejection of the recording contract, releasing Luke Records from its obligation to pay royalties. *Id.* at 1302. Another record label, Lil' Joe Records, Inc., then purchased the copyrights, and the transfer was documented by a copyright assignment. *Id.* at 1300-1302.

Several years later, Thompkins sued Lil' Joe Records, Inc., alleging that the rejection of the recording contract resulted in ownership of the copyrights reverting back to him. *Id.* at 1302, 1304. The Eleventh Circuit disagreed. *Id.* at 1306-07. In particular, the court reasoned that rejection operates differently on unperformed portions of a contract compared to those portions that are fully executed:

> There is no debate that Thompkins's transfer of his copyrights to Luke Records under the 1989 Agreement was an executed sale of property. The terms of the Agreement leave Thompkins not even so much as a contingent interest in the copyrights. . . . To the extent the 1989 Agreement was "executory," in the sense of not being fully executed, it was only insofar as Luke Records was required to pay Thompkins royalties based on any future sales of his records. The transfer of the copyrights was fully executed, however, and Luke Records held full legal and equitable title under the terms of the Agreement.

*Id.* at 1307-08.

This case presents an analogous situation. Although Edwards possesses some degree of

copyright ownership,[3] the administration rights were fully executed pursuant to the copyright assignments, the Settlement Agreement, and the Co-Publishing Agreement.   Indeed, Edwards admits that "the precise language included in the Assignments is critical."   Doc. 15 at 7.   But Edwards cites no authority that would permit the bankruptcy court, acting under 11 U.S.C. § 365(a), to re-write the terms of the copyright assignments and the court-approved Settlement Agreement.

The bankruptcy court correctly held that a motion to reject may not be used to alter the parties' substantive rights and liabilities.  The Court therefore affirms the bankruptcy court's denial of the motion to reject.

## B.   Artist and Producer Royalties

Edwards' second issue on appeal challenges the bankruptcy court's holding that she is not entitled to a portion of Mr. Edwards' artist and producer royalties.

In rejecting that claim, the bankruptcy court relied on the Settlement Agreement, which gave Edwards "a 37 ½ percent participation in the income stream *from the copyrights owned*" by the estate. Doc. 10-342 at 3 (emphasis added).   As the bankruptcy court accurately observed, the Settlement Agreement does not give Edwards any royalty income; it only gives her a share of the copyright income.   The bankruptcy court concluded that "copyright" is a "well-understood term" that does not include income from sources other than the compositions themselves. Doc. 11-2 at 18-19.  In support, the bankruptcy court cited the testimony of both copyright experts.  *Id.* at 19 n.89.

On appeal, Edwards first argues that the bankruptcy court erred in interpreting the Settlement

---

[3] The Copyright Act, 17 U.S.C. § 101, defines a "copyright owner" as the owner of "any one of the exclusive rights" listed in 17 U.S.C. § 106.  The exclusive rights are transferable separately and include the right "to authorize" any of the exclusive rights.  17 U.S.C. § 201(d)(2); 17 U.S.C. § 106.

Agreement by reciting, in the factual findings, that the Connecticut probate court denied her claim for a spousal share. *See* Doc. 11-2 at 4. As Edwards pointed out in her motion for new trial, the probate court allowed her claim for a spousal share. Edwards thus contends that "the bankruptcy court did not accurately appreciate the parties' obvious intent at mediation and in crafting the July 9th Stipulation." Doc. 13 at 22-25.

Before turning to Edwards' argument regarding the parties' intent, the Court notes that Edwards appears to concede that the language of the Settlement Agreement controls over the July 9th Stipulation. Doc. 13 at 23 at n.13. In fact, Edwards could hardly argue otherwise. The Settlement Agreement was the only document executed by all of the interested parties, it was the only document approved by the probate court as required under Connecticut law, and it was the only document expressly preserved by the General Release.

Nonetheless, Edwards contends that the bankruptcy court was required to interpret the Settlement Agreement in light of all the circumstances, including the terms of the July 9th Stipulation. Doc. 13 at 25. The Court is not persuaded.

The parties agree that Connecticut law controls the interpretation of the Settlement Agreement. Doc. 11-29 at 12; Doc. 13 at 25 n.15; Doc. 11-429 at 30. Under Connecticut law, the Court may only consider extrinsic evidence if there is an ambiguity present on the face of the Settlement Agreement:

> [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . *When only one interpretation of a contract is possible, the court need not look outside the four corners of the contract* . . . .A contract is unambiguous when its language is clear and conveys a definite and precise intent. . . .Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the

> language is ambiguous. . . .*[A]ny ambiguity in a contract must emanate from the language used by the parties*[.]

*Nation-Bailey v. Bailey*, 112 A.3d 144, 151 (Conn. 2015) (internal quotation marks omitted and emphasis added).

Critically, Edwards does not challenge the bankruptcy court's determination that the word "copyright" is a "well-understood term," which does not "include income from sources other than the compositions themselves." Doc. 11-2 at 18-19. Absent some argument from Edwards that this language is ambiguous, review of extrinsic agreements, testimony, and other evidence is not proper. *Yale Univ. v. Cigna Ins. Co.*, 224 F. Supp. 2d 402, 423 (D. Conn. 2002) ("Under Connecticut law "any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms.")

Accordingly, the bankruptcy court properly found that the "parol evidence rule bars the use of extrinsic evidence, such as the July 9th Stipulation, to vary or contradict the terms of the Settlement Agreement." Doc. 11-2 at 15 n.74. For this same reason, any error in the bankruptcy court's factual finding regarding the spousal share is harmless because the court was not permitted to consider the motivations of the parties. Rather, as the bankruptcy court correctly held in the order denying Edwards' motion for a new trial, "the Settlement Agreement is the operative document." Doc. 10-6 at 4.

Edwards next argues that the bankruptcy court's interpretation of the Settlement Agreement conflicts with the parties' course of performance under the agreement, as well as statements made in tax filings. Because the bankruptcy court addressed these points, the Court reviews Edwards' specific challenges.

Edwards first maintains that her claim for artist and producer royalties is supported by the

fact that the estate paid her artist and producer royalties while the probate case was pending.  Doc. 13 at 26-27.  Once the estate closed, she began receiving quarterly payments that did not include the royalties.  *Id.*

With respect to this issue, the bankruptcy court credited testimony from four witnesses that there was no workable method to allocate expenses to specific sources of income while the estate was open.  Instead, the income from all sources was placed into a single account, all of the expenses were paid from that account, and Edwards and the other parties received the remainder of the income based on the percentages identified in the Settlement Agreement.  Doc. 11-2 at 22.

On appeal, Edwards argues that this explanation directly conflicts with the evidence. However, the cited portions of the record reveal no such direct conflict.  Franson explained at trial that the income distributions were made because the probate judge ruled that Edwards and Alexis Edwards would have to receive a 50% share any time that the children received a distribution.  Doc. 10-544 at 42-43, 85-86.  JSM's owner, Richard Mandel, testified that Edwards was receiving distributions from "the cash that was available at that time."  Doc. 10-542 at 43.  He further testified that the distribution letters simply referred to "income."  *Id.* at 46-48.  Collectively, this evidence supports the bankruptcy court's finding that the income distributions were made out of necessity from a single account.

Edwards alternatively suggests that the bankruptcy court and Defendants have failed to offer any explanation as to why BEC has been able to allocate the same sources of income since the estate closed.  Doc. 13 at 27.  But it is ultimately Edwards' burden to prove her case, and on appeal it is Edwards' burden to show a clear error of fact.  She fails to discharge her burden with a speculative and unsupported contention.  *In re Kane*, 755 F.3d 1285, 1288 (11th Cir. 2014) ("generally we will

not disturb a bankruptcy court's credibility determinations"); *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.")

Edwards also relies on the estate's tax returns, which reflected that Edwards received "37.5% of the net estate" pursuant to a "Settlement of Claim dated 7/9/1997." Doc. 10-325 at 17. In addition, the estate claimed substantial deductions based on Edwards' receipt of 37.5% of the "net estate." Doc. 10-542 at 12-25. Edwards maintains that the "net estate" necessarily included artist and producer royalties, further demonstrating her entitlement to those amounts.

The tax returns were filed on July 17, 1997, thirteen days before the Settlement Agreement was finalized. Doc. 11-2 at 19. As the bankruptcy court correctly found, the tax returns specifically stated that "final documentation" for the settlement was not available, and that upon "future request, the estate will provide a copy of the final settlement agreement approved by the Court." Doc. 10-228 at 94. According to Mandel, the tax returns represented the estate's best efforts to put the IRS on notice of what the marital deduction might be, in the face of a filing deadline. Doc. 10-542 at 90-91. The bankruptcy court found that this explanation was credible, and further noted that there was no indication that Edwards ever relied on the tax returns. Doc. 11-2 at 19-20.

Edwards insists that the estate's explanation is undercut by the fact that the estate never amended the returns to reflect the actual terms of the Settlement Agreement. Doc. 13 at 29; *see* Doc. 10-542 at 18-19, 31, 35-36, 38. But that fact does not directly call into question the estate's initial decision to report that Edwards received 37.5% of the net estate. And even on appeal, Edwards cites no evidence to indicate that she ever relied on the tax returns.

Based on the foregoing, the Court affirms the bankruptcy court's decision that Edwards'

17

37.5% interest in the income stream from the copyrights does not include any income from artist and producer royalties. The Court therefore need not address the parties' remaining arguments regarding the statute of limitations.

**C.   JSM's 5% Fee**

In her final issue on appeal, Edwards argues that the bankruptcy court erred by finding that JSM is entitled to collect a 5% fee and that JSM holds a valid 5% lien on the copyright income.

The Settlement Agreement states: "All parties agree and approve the claim by Jess S. Morgan & Co. for a 5% fee on all deferred income and other income received *by the estate* of Bernard Edwards from copyrights as a debt of the decedent." Doc. 10-342 at 6 (emphasis added). Citing the italicized language, Edwards maintains that a 5% fee was payable only while the probate case was open. Inconsistently, Edwards also argues that the 5% fee was payable only while Franson personally performed services. Doc. 13 at 30-31. Edwards further maintains that even if the 5% fee was meant to endure in perpetuity, modification is warranted because JSM now provides only limited management services. Doc. 13 at 32-33. Edwards points out that the bankruptcy court did not address her request for modification.

Presumably, the bankruptcy court did not address the modification argument in light of the court's determination that Edwards' claim is time-barred. In particular, the bankruptcy court found that Edwards was aware of the 5% lien as of January 1, 2000, the date of the copyright assignment, which specifically referenced the 5% lien. In addition, Edwards was aware, or should have been aware, of the 5% fee by the time she received her first quarterly statement in March 2000. And by 2005, Edwards specifically protested the 5% fee to JSM, but she did not pursue a claim at that time. Instead, Edwards negotiated a sunset on the perpetual 10% fee that she paid to her probate attorneys.

18

Based on these facts, the bankruptcy court found that any applicable statute of limitations commenced in 2005 and had long since expired. Doc. 11-2 at 22-23.

Edwards raises two weak challenges on appeal. First, assuming that she is allowed to reject the Co-Publishing Agreement, Edwards argues that "JSM will no longer have a claim to support the lien" and the statute of limitations would "not even accrue until rejection." Doc. 13 at 33-34. For the reasons stated above, the Court affirms the denial of the motion to reject, rendering this argument moot.

Second, Edwards argues that "the circumstances have so changed that there is no continuing consideration to support the 5% fee to JSM and the perpetual fee should be terminated." Doc. 13 at 23. Edwards maintains that this change "accrued well within the limitations period, and thus, the statute imposes no bar." *Id.* Edwards cites no fact in the record to support this assertion, and she therefore fails to demonstrate error.

Based on the foregoing, the Court affirms the bankruptcy court's decision that Edwards is bound by the 5% fee and that JSM's 5% lien is valid.

## V.   Conclusion

Upon consideration, it is **ORDERED** that:

(1)     The Court **AFFIRMS** the bankruptcy court's November 2, 2016, Findings of Fact, Conclusions of Law and Final Judgment and **AFFIRMS** the bankruptcy court's January 27, 2017, Order Denying Debtor/Plaintiff's Motion for New Trial, or Alternatively, for Amended and Additional Findings of Fact.

(2)     The Clerk is directed to **ENTER JUDGMENT** in favor of Defendants-Appellees Bernard Edwards Company, LLC and Jess S. Morgan & Co., Inc.  Pursuant to Federal Rule of Bankruptcy Procedure 8024, upon entry of judgment, the Clerk is directed to immediately transmit

a notice of the entry to each party, to the United States trustee, if any, and to the bankruptcy clerk,

together with a copy of this order.

        (3)      The Clerk is directed to **CLOSE** this case and the three member cases, 8:17-cv-331-

CEH, 8:17-cv-330-CEH, 8:17-cv-329-CEH.

        **DONE AND ORDERED** in Tampa, Florida this 1st day of November, 2017.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record

20